EWING HILL, Respondent, *v.* A. J. MORRIS ET AL., Appellants.

March 18, 1884.

1. AGENCY—PRIVITY OF CONTRACT.—A sub-agent has no right of action against the principal where the intermediate agent is an independent contractor.

2. —— BROKER.—A broker, who receives business from another broker under an agreement to interchange business and to divide commissions, the forwarder being the guarantor of the order, can not recover commissions from the principal.

APPEAL from the St. Louis Circuit Court, LUBKE, J.
*Reversed and remanded.*

H. E. MILLS, for the appellants: The sub-agent can not sue the principal. He must look to the agent who employs him, and that agent must look to the principal. — *Trafton v. United States,* 4 Story, 653; *Corbett v. Schumacher,* 83 Ill. 403; *Hoover v. Wise,* 91 U. S. 311. To hold the principal to payment, the element of privity of contract between the principal and sub-agent should appear. Acts of recognition and the acceptance of services on the part of the principal do not necessarily tend to prove ratification. — *Homan v. Brooklyn Life Ins. Co.,* 7 Mo. App. 22; *Cockran v. Irlam,* 2 M. & S. 303. A custom that one may act for both parties is not consistent with good morals and sound policy, and is not to be upheld by the courts. — *Farnsworth v. Heimmer,* 1 Allen, 494; *Raisin v. Clark,* 41 Md. 158; *Walker v. Osgood,* 98 Mass. 352.

MCKEIGHAN & JONES, for the respondent: A general custom of trade touching the subject of a contract forms a part of the contract; and parties dealing in a matter about which a custom exists are presumed to know the existence of the custom, and to incorporate it into and make it a part of their contract. There was no pretence, however, that

appellants were ignorant of the usages and custom pertaining to contracts of sale for future delivery. — *Kingsburg* v. *Kirwin*, 6 Cent. L. J. 228; *South F. & C. P. Co.* v. *Stanard*, 44 Mo. 71; *Walls* v. *Bailey*, 49 N. Y. 464. Touching the question whether the transactions involved in this case were wagering or gaming, it is sufficient to say that no such issue is raised by the pleadings, and no such question was raised in the court below. The evidence, however, shows that they were not wagering. The fact that subsequent to the making of the contract of sale Morris told Hill, that he, Morris, was only scalping the market, could not have the effect of relating back to the time of making the contract of sale and tend to show that it was wagering. It is only necessary to refer to *Williams* v. *Tiedeman* (6 Mo. App. 269), and *Kent* v. *Miltenberger* (16 Cent. L. J. 433), for the whole subject of wagering contracts.

THOMPSON, J., delivered the opinion of the court.

This was an action for losses, including commissions and telegrams, upon a transaction whereby five hundred barrels of pork were sold for the account of the defendants on the Chicago Board of Trade, under circumstances hereafter stated. There was a verdict and judgment for the plaintiff.

As to the parties to the action. The action was originally brought by Melville S. Nichols and George Nichols, of Chicago, jointly with Ewing Hill, of St. Louis. Subsequently, Melville S. Nichols assigned the cause of action to Hill; the latter was substituted sole plaintiff by consent of the defendants, and thereafter filed an amended petition as such. George Nichols never had any interest in the transaction, and he has passed entirely out of the case. The *status* and relation of the parties at the time of the transaction in question were as follows: The plaintiff, Hill, was a broker doing business on the Merchants' Exchange in St. Louis, under the name of Ewing Hill & Co. The de-

fendants were partners in trade as packers and dealers in provisions, in St.. Louis, under the firm name of Morris, Cox & Co. Melville S. Nichols was a broker or dealer on the Board of Trade of Chicago, doing business under the style of M. S. Nichols & Co. Nichols and Hill were correspondents for each other, under an arrangement by which each would forward to the other orders for the sales or purchases of grain or provisions for future delivery, upon an agreement that the one forwarding the order should become the guarantor of its execution on the part of his principal; and also upon an agreement that the commissions accruing to the parties respectively upon the business so transmitted by one to the other should be equally divided between them.

The transaction in controversy was this: On the 29th of June, 1880, the plaintiff, Hill, and the defendant, A. J. Morris, of the firm of Morris, Cox & Co., met on the Merchants' Exchange in St. Louis, and there Morris gave to the plaintiff an order to sell five hundred barrels of pork for August delivery in Chicago. Thereupon Mr. Hill sent to Mr. Nichols in Chicago the following telegram : —

" M. S. N. & Co. : — Sell five hundred August pork. Morris, Cox & Co."

(Signed)                                " E. H. & Co."

A few minutes later the following telegram came back to the plaintiff from Chicago :

" E. H. : — Sold five hundred August pork, ninety-seven and a half, order of Morris, Cox & Co."

The testimony indicates that the plaintiff immediately exhibited this telegram to the defendant, Morris, who looked at it casually, and told him that it was all right. When Morris had the conversation with the plaintiff on the 30th of June he was all ready to start for Colorado with his family, on a journey of recreation, and did start that evening. In that conversation he gave the plaintiff certain instructions as to the manner in which the

plaintiff should take care of his "deal." As to the purport of these instructions, there is a discrepancy between the evidence of the plaintiff and that of Morris. The plaintiff testified that Morris told him that he, Morris, was going to Colorado, and that he wanted the plaintiff, if the market went down fifty cents a barrel, to buy the pork in, and if it reacted, say $1 a barrel, to sell five hundred barrels again to cover it on the same basis, and to make two or three transactions for him during his absence; but he gave him no instructions as to what he should do in case the market advanced. The instructions contemplated only the contingency of the market falling, or of its falling and subsequently reacting. On the other hand, the defendant Morris testifies that he informed the plaintiff that he was about to go away to be gone a month or six weeks; that he wanted the plaintiff to handle this deal on the fluctuations of the market; "if he (plaintiff) saw a chance to make a little money to do so; if it went down fifty cents why take it in; if it went up fifty cents to put a stop on it. I said to close the deal at a fifty cents loss, and if the market fluctuated enough to justify any scalping backwards and forwards with that deal, to make several deals while I was gone." The plaintiff testifies that he paid particular attention to Morris' instruction to close the deal whenever the market should go fifty cents in his favor, but he did not pay much attention to the other instructions, because he did not much think he would execute them while Morris was away; he did not think it would be satisfactory, and he did not want to take the chances of having any trouble with Morris on account of transactions which he might make for him during his absence.

Evidence was offered by the plaintiff tending to show a general custom in the great commercial cities of the United States to the effect that, where sales of provisions are made for future delivery by one dealer executing the orders of another dealer, the dealer making the contract becomes per-

sonally responsible for its execution; that if, at any time prior to the date of such delivery, the market rises or falls so as to make it probable that the dealer who has undertaken to execute the order will have to execute it at a loss, he is entitled to call upon the dealer giving the order, for what is called a " margin," that is to say, a sum of money sufficient to guarantee the former dealer from loss, and if this margin is not put up to " close the deal," as it is termed, by buying upon the market for account of such former dealer enough of the commodity sold at the ruling prices of such commodity for the same month for which it has been sold to enable him to execute the contract by delivering the same when the time shall arrive for such delivery. A question is made as to the sufficiency of the evidence to establish such a custom; but in the view we take of the case as here presented, it is unnecessary to consider this point.

Contrary to the expectations of Mr. Morris, almost immediately after he made this sale, the price of pork began to advance rapidly. Mr. Nichols demanded $500, and then $1,000, as margins, of the plaintiff. The plaintiff began to telegraph to Mr. Morris as early as the 2d of July; and when, on the 6th of July, Mr. Morris arrived at Manitou Springs in Colorado, he found several telegrams from the plaintiff informing him of the rapid advance in pork, and calling upon him for margins. The first of these, dated July 2d, ran thus: —

"*A. J. Morris:* — August pork twelve sixty-five; called five hundred margins. Please respond, or instruct your firm to do so. Answer.

" EWING HILL & Co."

The second, dated July 6th, ran: —

"*A. J. Morris:* — August, thirteen dollars. Have you responded to margin called?

" EWING HILL & Co."

A later one on the same day : —

"*A. J. Morris:* — August pork thirteen ten and strong ; called one thousand. Answer.

"EWING HILL & Co."

And on the 7th of July, one running thus : —

"*A. J. Morris:* — August thirteen ninety. Have you responded to margin? Called one thousand. Answer.

"EWING HILL & Co."

On the 7th of July, Morris sent a telegram from Manitou Springs to the plaintiff, as follows : —

"Message just received. Can't say what will do ; will write."

On the following day the plaintiff received a night message from Morris, dated Manitou, Colorado, July 7th, as follows : —

"*Ewing Hill & Co., St. Louis:* — 50 cts. limit was instructions. Let Chicago carry without margin till decline.

"A. J. MORRIS."

On the 7th of July, the plaintiff again telegraphed to Morris as follows, apparently referring to the first message to Morris : —

"*A. J. Morris:* — Message received ; unsatisfactory ; must have immediate margin or close deal. Cox says your firm will respond on telegraphic instructions from you. Please answer immediately. August closed at $14.05 strong.

"EWING HILL & Co."

On the 8th of July the plaintiff sent the following telegram to Morris : —

"*A. J. Morris:* — Bought five hundred August pork, Chicago, $14.25, to close your deal.

"EWING HILL & Co."

This ended the correspondence between them. This purchase of five hundred barrels of August pork for the purpose of closing Morris' deal was not made by Nichols of his own motion, but in response to the following telegram from the plaintiff, dated July 8th: —

" *To M. S. N. & Co.*; — If strong, buy five hundred August pork, Morris; don't fail to act promptly if at all."

When the month of August came around, Nichols received the pork which he had thus bought, and delivered it to one Crosby, to whom he had made the sale of June 29th at $11.97½ per barrel, and took up margins of $1,000 which he had been compelled to pay on the transaction, before he closed it out.

At the close of the plaintiff's testimony, the defendants asked for an instruction that, on the evidence, the jury must find for the defendant, which the court refused.

Whether this instruction was properly refused must, we think, depend upon the view which is taken of the relation of the three parties, Morris, Hill, and Nichols, to each other. The position of the defendants now is that Morris and Hill were principal contractors; that Nichols was merely a contractor with Hill; in other words, that Hill was the agent of Morris and Nichols merely the agent of Hill; that there was, hence, no privity of contract between Morris and Nichols; that Nichols, therefore, had no right of action directly against Morris; consequently, that Hill, who sues here as the assignee of Nichols, and only upon such right of action as Nichols had, has neither stated nor proved a case which entitled him to recover. The learned counsel for the plaintiff answer this position by saying that Morris and Nichols were the principal contractors, and that Hill was merely the *del credere* agent of Nichols; and, at all events, they agree that this objection can not be made available here, because it was not made in the court below. We do not see from the record that, by any objection offered to the testimony, or by any instruction tendered, this question

was distinctly brought to the attention of the court below. But the request for an instruction for a non-suit necessarily involved within it every legal question which went to the foundation of the plaintiff's cause of action. It is not necessary that every question of law which is raised in this court should have been actually discussed in the court below, provided that the proceeding in the court below presented the question distinctly for determination, and provided the judgment which was rendered necessarily involved a decision of such question one way or the other. It is upon this ground that our supreme court holds that an objection which goes to the foundation of a cause of action as stated in the pleadings, need not be raised by matter of exception, but is available even when raised for the first time on a writ of error; and it is, perhaps, one of the unavoidable accidents of legal procedure, that views of law decisive of the controversy do not suggest themselves either to counsel or to the court in time to be available at the trial, and hence, that causes are sometimes reversed on views of the law which were not presented to the trial court. The difficulty extends even further; for cases have arisen where our own judgments were reversed by the supreme court on grounds of law which were not presented at all in this court. These suggestions make it clear that an appellate court is bound to decide the case before it upon the governing principle of law which arises upon the record, whether that principle was considered by counsel and the court at the original trial or not.

Our view, then, upon the question now raised is that Morris and Hill were principal contractors; that, by the contract between them, Hill made himself the agent of Morris to sell the five hundred barrels of pork for future delivery on the Chicago market, using his own instrumentalities to effect the sale; that he was not constituted an agent to appoint another agent for this purpose, but that he was an independent contractor; that Nichols was merely

his agent, and not the agent of Morris; that there was no privity of contract between Nichols and Morris; that Nichols could not maintain upon the contract an action against Morris and the partners of Morris, because he had no contract with Morris; but that whatever cause of action he may have had was against Hill only, with whom the contract which he made was made.

In other words, we think it clear that the position of Nichols was that which is sometimes termed in law that of a sub-agent; and the general rule unquestionably is that the principal, on the one hand, has no right of action against the sub-agent ( *Trafton* v. *U. S.*, 3 Story C. C. 646, 656; *Hoover* v. *Wise*, 91 U. S. 308, 311; *Homan* v. *Brooklyn Life Ins. Co.*, 7 Mo. App. 22); nor, on the other hand, has the sub-agent a right of action against the principal ( *Corbett* v. *Schumacher*, 83 Ill. 403), where the position of the intermediate agent was that of an independent contractor or undertaker. The application of this rule is, indeed, surrounded with embarrassments, but there is no difficulty in applying it to the facts of this case. A single suggestion will show its appropriateness in its application to these facts. Suppose that when Morris gave the order to Hill on the floor of the Merchants' Exchange of St. Louis, on the morning of the 29th of June, 1880, to sell five hundred barrels of pork for August delivery on the Chicago market, Hill had immediately telegraphed the order to Nichols at Chicago, and Nichols had negligently failed to execute is until the next day, by which time the price of pork had advanced $1 per barrel. Morris, by this negligence, might have sustained a loss of $500. But suppose he had brought an action for such loss against Nichols, would it not have been a perfectly good answer for Nichols to say, "I had no contract with you. The order which I received came from Hill. Hill was your principal in the contract, and you must look to him?" We think that there can be no doubt that, on such a state of facts, Morris

would have had no right of action against Nichols; and for the same reason, Nichols had no right of action against Morris; for if Nichols and Morris stood in a state of privity of contract with each other, their obligations and liabilities each toward the other were mutual, each would have had a right of action against the other for a breach of the undertaking on the part of the other. But, as Hill stood between them as an independent contractor, there was no privity between them, and neither had a right of action against the other. Morris had no more right of action against Nichols than he would have had against a clerk of Hill, whom Hill might have sent to Chicago to execute the contract. He had no more right of action against him than he would have had against Geltmacher, the employee of Nichols, by whom the pork was actually sold on the Chicago Board of Trade.

If we are correct in these views, it is clear that the plaintiff's evidence entirely failed to prove the cause of action stated in the petition, and, therefore, the instruction for a non-suit ought to have been given.

The judgment is accordingly reversed and the cause remanded. All the judges concur.